J-S32001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.J.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.R.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 243 MDA 2023 |

Appeal from the Decree Entered December 22, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9298

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY DUBOW, J.:                    **FILED: OCTOBER 19, 2023**

S.R.W. ("Mother") appeals from the December 22, 2022[1] decree that terminated her parental rights to twelve-year-old A.J.J.R.  ("Child").[2]  Upon review, we affirm.

The relevant factual and procedural history is as follows.  In 2020, then-9-year-old Child was living with his paternal great-grandmother ("PGG") when PGG became ill, prompting Mother to remove Child from PGG's care.  Soon thereafter, Mother reached out to the Luzerne County Children and Youth Services (the "Agency") to request help with housing.  The Agency provided Mother with assistance securing a hotel, as well as making referrals for permanent housing.  On November 18, 2020, Mother attempted to smother

---

[1]  The trial court dated the decree December 21, 2022 but did not docket the decree until December 22, 2022.  We have changed the caption accordingly.

[2] Child's father is deceased.

Child with a pillow. The next day, Mother contacted the Agency, presented with mental health issues, and stated that she was unable to care for Child. At the time, neither Mother nor Child disclosed the pillow incident. Nevertheless, the Agency immediately obtained custody of Child and placed him in foster care.

The Agency developed a permanency plan and recommended the following objectives, which the trial court ordered Mother to complete: (1) participate in drug and alcohol services;[3] (2) submit to random drug and alcohol screens; (3) engage in mental health treatment; (4) complete parenting education; (5) obtain suitable housing; and (6) consistently visit with Child.

On November 23, 2020, the Agency referred Mother for an Intensive Family Reunification Service ("IFRS") program to assist with meeting her parenting education objective and facilitating visitation. Mother failed to consistently attend IFRS sessions or maintain contact with her case manager. IFRS caseworkers had ongoing concerns about the inappropriate conversations that Mother would have with Child during visitation as she often discussed her personal love life. On November 15, 2021, IFRS closed Mother out of services and noted that she had failed to follow through with mental health services.

_____

[3] The Agency learned that Mother was serving probation for a prior DUI conviction.

On December 9, 2020, Mother participated in intake at Robinson Counseling Center where staff diagnosed her with an adjustment disorder with depressed mood and referred her for bi-weekly outpatient therapy. Mother only participated in two sessions before the counseling center discharged her from services on November 30, 2021, for non-compliance. The Agency also referred Mother for mental health treatment at Community Counseling Center and Family Service Association, but Mother failed to comply.[4]

On July 13, 2021, the Agency received a report that Mother attempted to smother Child with a pillow in November 2020. The Agency investigated the allegations and indicated Mother as a perpetrator of abuse against Child.

Mother consistently maintained contact with the Agency and participated in supervised visitation with Child every other Friday until October 8, 2021, when Mother ceased both.

Mother submitted to six out of eight random drug screens. Mother tested positive one time for ethyl alcohol metabolite and submitted one diluted sample, making it difficult to detect any traces of drug or alcohol.

On January 18, 2022, police arrested Mother and charged her with Strangulation, Simple Assault, and Endangering the Welfare of a Child in

---

[4] On May 17, 2022, after the Agency filed a termination of parental rights petition, the Agency re-referred Mother for mental health services and on June 22, 2022, Mother attended an intake appointment where mental health evaluators diagnosed her with generalized anxiety and recommended ongoing counseling sessions.

connection with the 2020 incident where she attempted to smother Child with a pillow.[5]

On March 1, 2022, the Commonwealth issued a bail bond prohibiting Mother to have contact with Child. At the time, Mother had not visited with Child in the previous five months.

On March 21, 2022, the Agency filed a petition to involuntarily terminate Mother's parental rights to Child. The trial court appointed Corbett Price Law, L.LC., to serve as both Child's legal counsel and guardian ad litem ("GAL"), after determining there was no conflict between the dual roles.

The trial court held hearings regarding the petition on July 20, 2022, and October 17, 2022. The court heard testimony from Nicole Nickolich, Agency caseworker; George Hockenbury, an employee at Northern Tier Research; Rebecca Ciliberto, case manager in the Intensive Family Reunification Service program at Family Services Association; Alicia Singer, an outpatient therapist at the Robinson Counseling Center and records custodian for the Agency; and Paul Guido, an Agency supervisor, each of whom testified in accordance with the above recitation of facts.

In addition, Ms. Nickolich testified that Mother failed to engage in or complete mental health treatment or consistently visit with Child despite the Agency referring Mother to multiple mental health providers, including

---

[5] On November 8, 2022, the trial court convicted Mother of simple assault and on January 5, 2023, the court sentenced Mother to serve 6 to 24 months' incarceration.

Community Counseling Center and Family Service Association. Ms. Nickolich further testified that terminating Mother's parental rights was in Child's best interest. Ms. Nickolich explained that Child has a weak bond with Mother. Ms. Nickolich testified that Mother's untreated mental health negatively impacted Child, both emotionally and physically, when she attempted to smother him with a pillow. Ms. Nickolich explained that during visits with Child, Mother would constantly talk about her ex-boyfriend and how he caused all her problems. Ms. Nickolich stated that Mother would often cry, and Child would proceed to console Mother, causing caseworkers to redirect Mother or end the visit.

Child testified *in camera* and wrote a letter to the Court expressing his desire to cease contact with Mother and remain living with his foster parents. Child testified that he wanted Mother out of his life. He explained that he has felt hatred toward Mother for the last three years, since "[s]he tried to kill me" when she smothered him with a pillow. N.T. Hearing, 10/17/22, at 5-6. Child explained that he has not visited with Mother in about a year and explained that Mother always talked about "adult stuff" when they did have visitation. *Id.* at 9. Child expressed a desire to continue to live with his foster parents because he considers them more of a family than Mother. Child explained that he feels safe, loved, and happy in the foster parents' home. Child calls the foster parents "Mom and Dad," while he refers to Mother by her first name because "I don't feel like she deserves to be called my mother anymore." *Id.* at 5.

Mother testified regarding her continued efforts to receive mental health treatment. Mother explained that she participated in counseling over the phone for an hour and the counselor informed her "your evaluation for your court order is done." *Id.* at. 35. Mother testified that she went to Community Counseling Center and met with three different counselors, which Mother explained was the reason that she was not able to sign a release form for the Agency. Mother further explained that Community Counseling Center cancelled her appointment due to Covid, advised her to call back the next week, and failed to answer the phone when Mother called five times. Mother informed the court that she participated in three telephone therapy sessions over a period of two years. Mother explained that she intended to call Community Counseling Center that day to get another intake appointment.

On December 21, 2022, the trial court terminated Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). Child's GAL agreed with this disposition.

Mother filed a notice of appeal.[6] Mother subsequently filed a Rule 1925(b) statement, and the court filed a responsive Rule 1925(a) opinion.[7]

Mother raises the following issues for our review:

1. Whether the trial court abused its discretion and/or committed an error of law in determining the parental rights of [Mother] to [Child] should be terminated pursuant to 23 Pa.C.S. [§ 2511(a)(2), (5), and (8).]

2. Whether the trial court abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.[] § 2511(b) have been satisfied and the best interests of [Child] served by terminating the parental rights of [Mother].

Mother's Br. at 4.

**A.**

In addressing Mother's issues, we are mindful of our well settled standard of review. When we review a trial court's decision to grant or deny

_____

[6] We deem Mother's *pro se* notice of appeal, which she filed two days late from prison despite being represented by counsel, to be timely pursuant to the prisoner mailbox rule. Pa.R.A.P. 121 (f); *see Commonwealth v. Patterson*, 931 A.2d 710, 714 (Pa. Super. 2007) (applying prisoner mailbox rule); *see also Commonwealth v. Williams*, 151 A.3d 621, 624 (Pa. Super. 2016) (holding that, unlike other filings, because notice of appeal protects a constitutional right this Court is required to docket a *pro se* notice of appeal despite an appellant being represented by counsel).

[7] Although Mother failed to file a Rule 1925(b) statement contemporaneously with her Notice of Appeal, *see* Pa.R.A.P. 1925(a)(2)(i), (b), we decline to dismiss on this basis because no party asserted prejudice. *See In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a Rule 1925(b) statement contemporaneously with a notice of appeal in a children's fast track case will result in a defective notice of appeal which this Court will address on a case-by-case basis, avoiding the extreme action of dismissal when the defect does not prejudice any party).

a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

## B.

In her first issue, Mother avers that the trial court abused its discretion when it terminated Mother's parental rights pursuant to Section 2511(a)(2). Mother's Br. at 6. Mother argues that she completed drug and alcohol treatment and complied with random drug screens, despite the absence of any "tangible concerns" for her sobriety. *Id.* at 9. Mother further argues that she completed parenting classes, obtained suitable housing, and remains engaged in mental health treatment. *Id.* at 10-12.

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights[,]" the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). Here, we concentrate our analysis on subsection 2511(a)(2).

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section

2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re D.L.B.*, 166 A.3d 322, 327 (Pa. Super. 2017). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *Id.* at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

Applying these principles, the trial court credited testimony from Ms. Nickolich, Mr. Guido, and Ms. Singer, that Mother failed to consistently engage in and complete mental health treatment. Trial Ct. Op., 4/12/23, at 5. The trial court also credited Ms. Ciliberto's testimony that Mother's failure to complete mental health treatment affected her ability to successfully complete parenting classes through IFRS, her visits with Child, and her overall ability to parent and provide for Child's basic needs. *Id.* at 6. As evidenced by the trial court crediting the testimony above, the court simply did not believe or place

weight on Mother's testimony that she repeatedly attempted to engage in mental health services. Moreover, her attempts now, at the last hour, to engage in mental health services are both untimely and disingenuous.

Perhaps most notably, Mother failed to consistently visit with Child and, when she did visit, her interactions with Child were objectionable. The trial court emphasized Mr. Guido's testimony that Mother ceased visitation with Child five months prior to implementation of the bail bond restriction on March 1, 2022. Trial Ct. Op. at 13. The court noted, "no one precluded Mother from seeing [C]hild between October 8, 2021 and March 1, 2022." *Id.* Moreover, Ms. Nickolich, Ms. Ciliberto, and Mr. Guido all testified credibly that Mother's interactions with Child during visitation were inappropriate, often resulting in Child comforting Mother regarding her love life. *Id.* at 6, 9, 11, 13, 21.

Based on the evidence discussed above, the trial court concluded that Mother was incapable of parenting. The court opined:

> This court finds that [] Mother cannot offer [Child] the basic physical, developmental and emotional needs that [Child] require[s] and should have throughout his future life. Mother has been given ample time to address and remedy her problems but has failed to successfully do so. The [c]ourt finds that she is unable to meet [Child]'s needs.

*Id.* at 25.

Our review of the record supports the trial court's findings, and we decline to reweigh the evidence or usurp the trial court's credibility determinations. Mother's actions over the past three years demonstrate that

she is unwilling or incapable of providing essential parental care to Child. Accordingly, we find no abuse of discretion.

**C.**

In her next issue, Mother avers that the trial court abused its discretion when it found that termination of Mother's parental rights would be in Child's best interest. Mother's Br. at 13. Mother argues that it was the bail restriction, rather than her own actions, that precluded her contact with Child and affected their parent-child bond. *Id.* at 13-14.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond

- 12 -

to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d at 1121.

Instantly, the trial court credited Ms. Nickolich's testimony that it was in Child's best interest to terminate Mother's parental rights and that Child had a weak bond with Mother. Trial Ct. Op. at 10. The court also credited Child's testimony that he wanted Mother "out of his life" and wished to remain living with his foster parents, who he calls "Mom" and "Dad" and considers to be his family. Trial Ct. Op. at 14. Moreover, the trial court credited and emphasized Ms. Nickolich's testimony that Mother and Child had an inappropriate relationship prior to the bail bond restrictions, and that terminating Mother's parental rights would not detrimentally impact Child. The trial court opined:

> Ms. Nickolich explained that Mother was having inappropriate conversations with [C]hild regarding her relationship with her boyfriend. Other times, Ms. Nickolich noticed that Mother was crying during the visit and [C]hild was consoling her by singing to her and giving her hugs. Ms. Nickolich testified that [C]hild was upset with [M]other having these inappropriate conversations with him. The parenting worker also addressed these concerns with Mother. Ms. Nickolich further emphasized that [C]hild is worried and fearful that in the event he returns to Mother that he may be smothered with a pillow again.
>
> Ms. Nickolich does not believe that, should the court terminate Mother's parental rights, there would be any detrimental impact upon the child. Based upon the testimony of Ms. Nickolich, the

> court finds that the termination of Mother's parental rights would best serve the needs and welfare of the child.

Trial Ct. Op. at 21. Our review of the record supports the trial court's findings. We decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we find no abuse of discretion in the trial court's conclusion that terminating Mother's parental rights was in Child's best interest.

**D.**

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a) and (b).

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/19/2023